1

2

3

4

5

6

7

8

9                         IN THE UNITED STATES DISTRICT COURT

10                      FOR THE EASTERN DISTRICT OF CALIFORNIA

11   ROLON LAMARR MORRIS II,

12            Petitioner,                    No. 2:06-cv-0354 GEB JFM P

13        vs.

14   TOM L. CAREY, Warden,

15            Respondent.                    <u>FINDINGS AND RECOMMENDATIONS</u>

16   _____/

17            Petitioner is a state prisoner, proceeding through counsel, with an application for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On October 27, 2003, petitioner was

19   convicted in Placer County Superior Court on the following: two counts of robbery (Cal. Penal

20   Code § 211), two counts of assault with a firearm (Cal. Penal Code § 245(a)(2)), two counts of

21   terrorist threats (Cal. Penal Code § 422), burglary (Cal. Penal Code § 459), false imprisonment

22   (Cal. Penal Code § 236), cutting a utility line (Cal. Penal Code § 591), and being a felon in

23   possession of a firearm (Cal. Penal Code § 12021(a)(1)).  (Am. Pet. at 1-2.)  With the addition of

24   sentence enhancements for the use of a firearm (Cal. Penal Code §§ 12022.53 & 12022.5),

25   petitioner  was sentenced to 18 years in state prison.  (Clerk's Transcript on Appeal, (hereinafter

26   CT) at 240).

1

1    In the petition now pending before this court, petitioner seeks habeas relief on the

2   grounds that (a) the prosecutor's peremptory strike of an African-American woman from the jury

3   panel was based on race in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (b) his right to

4   due process was violated as a result of an unconstitutionally suggestive identification procedure;

5   and (c) his right to counsel was violated when the prosecutor improperly contacted a defense

6   fingerprint expert.  (Am. Pet. at 4, 12, 19.)  Upon careful consideration of the record and the

7   applicable law, the undersigned recommends that petitioner's application for habeas corpus relief

8   be denied.

9                              PROCEDURAL BACKGROUND

10    On November 23, 2004, the California Court of Appeal for the Third Appellate

11   District issued a reasoned opinion affirming petitioner's conviction and sentence.  (Answer, Ex.

12   B, hereinafter "Opinion.")

13    On December 30, 2004, petitioner filed a petition for review to the California

14   Supreme Court which was denied on February 16, 2005.  (Answer, Ex. C.)

15    On May 11, 2006, petitioner, proceeding pro se, filed his first petition in the

16   instant action.  (Docket No. 1.)  On July 28, 2006, the undersigned ordered the appointment of

17   counsel and petitioner, through counsel, filed his first amended petition.  (Docket No. 16 & 26.)

18   On May 4, 2007, respondent filed its answer.  (Docket No. 22.)  On July 30, 2007, petitioner

19   filed a traverse.  (Docket No. 36.)

20    On July 30, 3007, petitioner filed a motion for an evidentiary hearing to develop

21   the record on his <u>Batson</u> claim.  (Docket No. 37.)  On November 1, 2007, the undersigned heard

22   arguments on petitioner's motion and ordered an evidentiary hearing.  (Docket No. 42.)  The

23   evidentiary hearing was held on September 9, 2008; respondent called Estelle Tansey, the trial

24   prosecutor, as a witness.  (Docket No. 73.)

25   /////

26   /////

2

FACTS

The following facts were taken from an unpublished opinion of the California Court of Appeal for the Third Appellate District:

A
*The Robbery*

Harry Starfusky and Heather Thomas worked as hotel clerks at the Best Western Roseville Inn.  During her shift in the early morning hours of August 5, 2002, Thomas went outside to smoke a cigarette.

After her cigarette break, [petitioner] and another man came in the back door.  Both men had bandanas partially covering their faces. Thomas testified [petitioner] was wearing dark clothing, a hat, and a bandana.  Thomas got a look at [petitioner's] face because his bandana slipped during the robbery.

At the time of the robbery, Starfusky was on the telephone speaking with another hotel employee at a different hotel.  He dropped the phone when the robbers entered the room.  According to Thomas, one of the robbers ripped the phone wire out of the wall at that point.

[Petitioner] approached Thomas, pointed a gun at her head, and asked her where the money was.  Thomas responded by telling the robbers to take everything. [Petitioner] then told Thomas to sit down and she did.  Thomas told [petitioner] there was money in the register and in the safe in the back office but she did not know how to open the safe. [Petitioner] ordered her back into the room.

One of the gunman told Starfusky to hand over his wallet and get on the floor.  He did as he was told.  Later, Starfusky also went into the back room to help the robbers find more money.

When they were finished, the robbers told Thomas and Starfusky to lie on the ground and not to move for 10 minutes and then left. The robbers made off with some mail, Starfusky's personal canvas bag, and less then $300 in small bills.

Officer Jonathan Glover responded to the scene at approximately 1:37 a.m.  When he arrived at the hotel and went into the lobby, Thomas and Starfusky came out of the back office.  They provided a description of the suspects to officer Glover who in turn broadcast it to other patrol units.

/////

## B
### *Suspects Apprehended*

While Officer Pendergraft was responding to the robbery call, he saw [petitioner] walking down the street about 200 or 300 feet from the back door of the hotel.  Officer Pendergraft watched as [petitioner] threw a hat and bandana into the bushes.  After Officer Pendergraft detained [petitioner], he found Starfusky's wallet in [petitioner's] pocket but no gun.

While Officer Pendergraft was in the process of apprehending [petitioner], another man (Carter) jumped up and started running away.  Several $5 bills flew out of Carter's pocket as he ran.  The officers with Pendergraft gave chase and caught Carter.

Carter had about $180 in his pockets and had dropped $95 while he was fleeing from the officers–approximately the same amount of money stolen from the hotel.  Further, officers found a small black bag in the area from which Carter had jumped up and taken flight.  That bag contained a handset to a cordless phone, a loaded handgun, mail from the hotel, a set of keys, and Starfusky's personal items.

## C
### *The Field Showup*

About an hour after the robbery, the police took Thomas and Starfusky separately to field showups of two suspects.  A videotape of Thomas' field showup was played for the jury.  Officers showed each of the suspects to Thomas separately.  During Thomas' showup, officers placed a beanie on [petitioner's] head and a bandana in front of his face.  Thomas identified [petitioner] as one of the robbers.  She was unable to identify the other person.

The officer who accompanied Starfusky on his field showup testified Starfusky identified [petitioner] as one of the robbers.  The officer testified Starfusky focused on [petitioner's] build, jacket, and the type of pants he was wearing.  Like Thomas, Starfusky could not identify the other suspect.

## D
### *Trial Identification*

Thomas positively identified [petitioner] at trial as one of the robbers.  She thought the gun shown to her at trial looked familiar, but she was not sure.  Thomas also identified the cap and bandana taken from [petitioner] as consistent with what [petitioner] was wearing during the robbery.

/////

> At trial, Starfusky was less certain about his prior identification of [petitioner].  Starfusky testified he told the officers the suspect looked very much like one of the robbers after the officers zipped up [petitioner's] jacket.

(Opinion at 2-5.)

## ANALYSIS

I.  <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result.  <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63,

1    123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

2    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

3    The court looks to the last reasoned state court decision as the basis for the state court judgment.

4    Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

5    II.   Petitioner's Claims

6          A.   Batson

7                Petitioner alleges that his conviction should be vacated because the prosecutor

8    exercised a peremptory challenge to strike an African American juror on the basis of race, in

9    violation of Batson v. Kentucky, 476 U.S. 79 (1986).  (Am. Pet. at 4-12.)

10               1.   State Court Decision

11               The last reasoned decision with respect to petitioners' claim is the opinion of the

12   California Court of Appeal for the Third Appellate District on petitioners' direct appeal.

13   (Opinion at 9-16.)  The Court of Appeal explained the facts surrounding this claim and its legal

14   analysis as follows:

15                                    IV

16           *[Petitioner] Failed To Raise A Prima Facie Batson/Wheeler Error*

17           [Petitioner] next argues the trial court erred in rejecting his
             challenge to the prosecution's peremptory challenge to an African-
18           American juror, [Juror M].  We disagree.  This contention is also
             frivolous.
19
                                    ***
20
             After [examining Juror M], the prosecutor exercised her
21           peremptory challenge against another juror, and when the
             challenge returned to her, she thanked and excused Juror M.
22
             The court and [trial] counsel engaged in the following discussion:
23
                     Mr. Zimmerman: I believe that there is a reasonable
24                   inference under State and Federal law that this juror,
                     [Juror M] is being requested to be excluded because
25                   of her group association; that is, she is an African-
                     American woman, and the Court can take clear
26   /////

                                    6

notice of the fact that there are no other African-American jurors left.

There was one African-American juror [who] was here this morning [who] left because she could not afford to stay.  She doesn't get paid, and that was something you applied across the board to everyone. . . .

We have had one African-American juror the entire venue, not just in the entire panel, but in the entire county.  In Placer, the demographics are changing.  We're getting more minority people.  We know [petitioner] is an African-American.  We can't get too systematic.  We have one juror.

What do we know about this juror, she has a child [who is] a college student.  She's educated, intelligent, make a fine juror.  In Baxter-Wheeler [sic], line of Wheeler, both Federal and State law and the prosecution should shift the burden, and I don't think there is any viable reason whatsoever other than her group association why this prosecution is excluding this juror.

The Court: Ms. Tansey, do you wish to respond?

Ms. Tansey: Your honor, do you feel that a prima facie case has been made?

The Court: I was a little concerned that I may have misheard the juror.  That's why I went back to her to inquire about the proof beyond all possible doubt.  I have to say, I found the juror articulate, intelligent, responsive.  I saw nothing that I could see for either side to exercise a peremptory challenge.

As the cases make clear, the Baxter-Wheeler [sic] challenge is generally focused on a pattern of exercising a peremptory.  We don't have that situation with this challenge.  I am sympathetic to the fact that Mr. Zimmerman has raised a concern because we only have one African American juror in the area in the panel, but it's my experience that this is about the third or fourth African-American I've ever had on any jury in 25 years.  It just doesn't happen.

I can also take note of the fact that you had not exercised a challenge against the previous juror who was African-American.  I have not seen you

7

exercise a challenge against other racial minorities. The prima facie basis has not been met.

*Discussion*

"Prospective jurors may not be excluded from jury service based solely on the presumption that they are biased because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. [Citations.]  A defendant bears the burden of establishing a prima facie case of <u>Wheeler</u> error. [Citation.]" <u>People v. Gutierrez</u>, 28 Cal. 4th 1083, 1122 (2002).

"Under <u>Wheeler</u> and <u>Batson</u>, "'[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association."' [Citations.]" <u>People v. Turner</u>, 8 Cal. 4th 137, 164 (1994).  "There is a presumption that a prosecutor uses his or her peremptory challenges in a constitutional manner." <u>Id</u>. at p. 165.

"If the court finds a prima facie case has been shown, the burden shifts to the prosecution to provide race-neutral reasons for the questioned peremptory challenges. [Citation.]  The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. [Citations.]  The explanations need not justify a challenge for cause. [Citation.]  'Jurors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.]'" <u>People v. Gutierrez</u>, supra, 28 Cal. 4th at p. 1122.

"The trial court's determination that no prima facie showing of group bias has been made is subject to review to determine whether it is supported by substantial evidence.  [Citation.]  We examine the record of the voir dire and accord particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand." <u>People v. Jenkins</u>, 22 Cal. 4th 900, 993-994 (2000).

"'When a trial court denies a <u>Wheeler</u> motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire.'  [Citation.]  'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'" <u>People v. Box</u>, 23 Cal. 4th 1153, 1188 (2000).

[Petitioner] failed to meet his burden to establish a prima facie <u>Batson</u>/<u>Wheeler</u> challenge here.  The record of the voir dire shows the prosecutor might reasonably have challenged Juror M. based upon the expression of her original opinion that she would hold the prosecution to a higher standard of proof than the law requires.  While the court and defense counsel may have misheard the juror's answer on this question, that answer standing alone was sufficient grounds for the prosecutor to challenge this juror.

Further, the absence of the prosecutor's improper motive to exclude African-Americans is demonstrated by the fact she did not choose to exercise a peremptory challenge against another African-American potential juror and her representation to the court she was "entirely comfortable" with that juror.  We defer to the trial court's conclusion that a prima facie case had not been made.

[Petitioner] also argues "[t]he court ruled that the *prima facie* case had not been made, largely on the erroneous rationale that a 'Baxter-Wheeler' [sic] motion requires a pattern of systemic exclusion."  This comment does not demonstrate the trial court misapprehended its rule under the <u>Batson</u>/<u>Wheeler</u> line of cases.  Rather, this argument takes the court's comments out of context in an attempt to create an appealable issue where none exists.  In context, the court's reference to the lack of systematic exclusion was in direct response to [petitioner's] lament:  "We have had one African-American juror the entire venue, not just in the entire panel, but in the entire county."  We do not read this isolated comment to suggest the court based its ruling on the lack of a systematic exclusion of two or more African-American jurors by the prosecutor in this case.

(Opinion at 9-16.)

          2.  <u>Standard of Review</u>

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  <u>See</u> <u>Batson</u>; <u>Johnson v. California</u>, 545 U.S. 162 (2005).  So-called <u>Batson</u> claims are evaluated pursuant to a three-step test:

First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations].  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations .]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then

1   decide . . . whether the opponent of the strike has proved
2   purposeful racial discrimination.' [Citation.]

3   Johnson, 545 U.S. at 168 (footnote omitted); Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir.

4   1999) (en banc).

5         In the instant action, the California Court of Appeal employed the incorrect legal

6   standard by using the "strong likelihood" test in determining whether petitioner had established a

7   prima facie case instead of the "inference" test articulated above.  (Opinion at 14.)  Accordingly,

8   this court will examine petitioner's Batson claim de novo.  Williams v. Runnels, 432 F.3d 1102,

9   1110 (9th Cir. 2006) ("because the state appellate court used the improper 'strong likelihood'

10   standard for evaluating Williams' Wheeler/Batson claim, the district court was required to

11   review the matter de novo."); Paulino v. Castro, 371 F.3d 1083, 1090 (2004) (federal court of

12   appeals examined Batson claim de novo because the state court used the wrong legal standard

13   when analyzing whether defendant made a prima facie showing of bias); Wade v. Terhune, 202

14   F.3d 1190, 1195 (9th Cir. 2000) (holding that when the state court uses the wrong legal standard,

15   the rule of deference required by 28 U.S.C. § 2254(d)(1) does not apply).

16         3.  Analysis

17         This court will evaluate petitioners' Batson claims with reference to the standards

18   set forth above.

19         i.  The Prima Facie Case for Discrimination

20         First, the defendant must make out a prima facie case "by showing that the totality

21   of the relevant facts gives rise to an inference of discriminatory purpose."  Johnson, 545 U.S. at

22   168 (footnote omitted).  In order to establish a prima facie case of racial discrimination,

23   petitioners must show that "(1) the prospective juror is a member of a "cognizable racial group,"

24   (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the

25   circumstances raises an inference that the strike was motived by race." Boyd v. Newland, 467

26   F.3d 1139, 1143 (2006) (citing Batson, 476 U.S. at 96 and Cooperwood v. Cambra, 245 F.3d

1042, 1045-46 (9th Cir. 2001)).  A prima facie case of discrimination "can be made out by

offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an

inference of discriminatory purpose.'"  <u>Johnson v. California</u>, 545 U.S. at 169 (quoting <u>Batson</u>,

476 U.S. at 94.)[1]  In evaluating whether a defendant has established a prima facie case, a

reviewing court should consider the "'totality of the relevant facts' and 'all relevant

circumstances' surrounding the peremptory strike."  <u>Boyd</u>, 467 F.3d 1146 (quoting <u>Batson</u>, 476

U.S. at 94, 96).  This should include a review of the entire transcript of jury voir dire in order to

conduct a comparative analysis of the jurors who were stricken and the jurors who were allowed

to remain.  <u>Boyd</u>, 467 F.3d 1144, 1149 ("We believe, however, that Supreme Court precedent

requires a comparative juror analysis even when the trial court has concluded that the defendant

failed to make a prima facie case").  <u>See</u> <u>also</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005) (using

comparative analysis, in a case in which a prima facie showing had been made, to determine

whether the prosecutor had been motivated by racial bias in exercising peremptory challenges).[2]

        Here, the prosecutor's peremptory challenge against Juror M effectively removed

all African-Americans from the jury pool.  The only other African-American juror had been

excused from jury service on financial hardship grounds before the prosecutor had an opportunity

to exercise any challenge at all.  (Reporter's Transcript on Appeal, hereinafter "RT," at 197.)  In

---

[1]  In <u>Batson</u>, defense counsel timely objected to the prosecutor's use of peremptory challenges because they resulted in striking "all black persons on the venire."  <u>Id.</u>, 476 U.S. at 100.  The Supreme Court held that this was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly rejected the objection without requiring the prosecutor to give an explanation for his action."  <u>Id.</u>

[2]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group."  <u>Boyd</u>, 467 F.3d at 1145.  <u>See</u> <u>also</u> <u>Kesser v. Cambra</u>, 465 F.3d 351, 360-362 (9th Cir. 2006) (en banc) (the "totality of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge.").  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ."  <u>Miller-El</u>, 545 U.S. at 241 ("side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" was "more powerful" than bare statistics).

1     addition, the trial judge stated that he "saw nothing . . . for either side to exercise a peremptory

2     challenge" to Juror M.  The trial judge's observations coupled with the prosecutor's removal of

3     the last African-American from the jury pool indicate that petitioner had demonstrated a prima

4     facie case of racial discrimination with respect to the prosecutor's exercise of a peremptory

5     challenge against Juror M.  Batson, 476 U.S. at 100; McClain v. Prunty, 217 F.3d 1209, 1224

6     (9th Cir. 2000).

7                 ii.  The Prosecutor's Explanation

8           At the second step of the Batson analysis, "'the issue is the facial validity of the

9     prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 360 (1991).  Here, the

10     prosecutor did not explain the use of the peremptory challenge for Juror M. because the trial

11     judge did not require it.  (RT 197.)  Therefore, on September 9, 2008, this court held an

12     evidentiary hearing to determine the prosecutor's reasons supporting her peremptory challenge of

13     Juror M. from the jury venire.[3]

14           For the second step of the Batson inquiry focusing on the prosecutor's

15     explanation, "a neutral explanation in the context of our analysis here means an explanation

16     based on something other than the race of the juror." Id. at 360.  "Unless a discriminatory intent

17     is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."

18     Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360).

19     For purposes of step two, the prosecutor's explanation need not be "persuasive, or even

20     plausible." Purkett v. Elem, 514 U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated

21     nonracial reasons, the court need not agree with them." Kesser v. Cambra, 465 F.3d at 351, 359

22

23         [3] Subsequent to the evidentiary hearing, petitioner filed a "Post-Hearing Brief" under seal
24     on October 24, 2008.  (Docket No. 79.)  On December 23, 2008, respondent filed a "Post-Evidentiary Hearing Brief."  (Docket No. 82.)  Petitioner filed a "Post-Evidentiary Hearing Reply
25     Brief" under seal on January 22, 2009 and a further "Notice of Supplemental Authority" under seal on July 21, 2000.  (Docket Nos. 87 & 89.)  This court has considered those briefs in issuing
26     these findings and recommendations.

(9th Cir. 2006).  "It is not until the third step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  Purkett, 514 U.S. at 768.

At the evidentiary hearing held almost five years after voir dire in the underlying criminal action, the prosecutor recited two reasons why she challenged the sole remaining African-American juror in the venire.

> The first and primary reason was that I believed this juror would hold me as a prosecutor to a higher standard of proof than proof beyond a reasonable doubt.  And even after the judge questioned her, I was convinced that she had a problem with the concept of reasonable doubt as being the standard of proof and she was not going to give the Peoples [sic] case a fair shake within the rules.

> \*\*\*

> Then there was something about the way she interacted with me that made me–that was big [sic] red flag for me.  The primary feature of that was that she would not look me in the eye.  She'd glance at me, but she wouldn't look me in the eye.

> And then there was something about her body language, but I–it's just been too long.  I can't remember exactly what that was, and there was nothing that helped me trigger that recollection.  There was something about her body language that made me feel that there was a hostility there.

(Transcript of Evidentiary Hearing (Docket No. 76), hereinafter "HT," at 8.)

None of the reasons articulated by the prosecutor at the evidentiary hearing demonstrated inherent discriminatory intent; thus, the reasons are deemed race-neutral.  Stubbs, 189 F.3d at 1105.  Accordingly, this court will proceed to the third step of the Batson analysis.

### iii.  Purposeful Discrimination

In the third step of a Batson challenge, the trial court has "the duty to determine whether the [petitioner] has established purposeful discrimination," Batson, 476 U.S. at 98, and must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  See Purkett, 514 U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of

13

1   intent as may be available.'" Batson, 476 U.S. at 93 (quoting Arlington Heights v. Metro. Hous.

2   Dev. Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363.  "[I]mplausible or

3   fantastic justifications may (and probably will) be found to be pretexts for purposeful

4   discrimination." Purkett, 514 U.S. at 768.  See also Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir.

5   2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the

6   proffered reasons, the reasons may be deemed a pretext for racial discrimination.")  In step three,

7   the court "considers all the evidence to determine whether the actual reason for the strike violated

8   [petitioner's] equal protection rights."  Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006).  "A

9   court need not find all nonracial reasons pretextual in order to find racial discrimination."

10  Kesser, 465 F.3d at 360.

11          Petitioner bears the burden of persuasion to prove the existence of unlawful

12  discrimination.  Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

13  from, the opponent of the strike.'" Johnson, 545 U.S. at 171 (quoting Purkett v. Elem, 514 U.S.

14  765, 768 (1995) (per curiam).  However, petitioner is "entitled to rely on the fact, as to which

15  there can be no dispute, that peremptory challenges constitute a jury selection practice that

16  permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96

17  (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953).

18          Petitioner claims that the prosecutor's reasons, described at the evidentiary

19  hearing, for striking Juror M were a pretext for racial discrimination.[4]  Thus, this court will

20  evaluate the record to determine whether the prosecutor's stated reasons for excluding Juror M

21  from petitioner's jury pass constitutional scrutiny.

22          The primary reason the prosecutor gave for exercising the peremptory challenge

23  against Juror M was "that she would hold us [the People] to a higher standard than beyond a

24  ────────────

25      [4]  Petitioner bears the burden of proving his factual contentions by a preponderance of the
    evidence rather than by clear and convincing evidence, because the state court decision is not
    entitled to deference under AEDPA.  See Taylor v. Maddox, 366 F.3d 992, 1013 n.16 (9th Cir.

26  2004).

1  reasonable doubt." (HT at 8.)  Juror M's first statements about reasonable doubt came from a

2  discussion with trial counsel during voir dire, as follows:

> MR. ZIMMERMAN:  You've seen television shows involving
> courtroom experience, Mattock [sic], Perry Mason, L.A. Law.
> You've had occasion to see that, is that a fair statement, on
> television?
>
> JUROR [M]:  Yes.
>
> MR. ZIMMERMAN:  In a courtroom, often times what happens
> here is like watching paint dry.  It's not like what happens on
> television.  There may not be some startling moment in a case
> where someone says:  It's the wrong guy.  I'm sorry.  That happens
> in the movies.  I think you understand that; right?
>
> JUROR [M]:  Yes.
>
> MR. ZIMMERMAN:  In this courtroom, whatever is brought
> before you as an evidence is for you as a trier of fact to consider.
> Do you have quarrel with the idea that our system, really kind of
> the cornerstone of our system is trial by jury?
>
> JUROR [M]:  No, I don't.
>
> MR. ZIMMERMAN:  Do you have any quarrel with the idea in a
> criminal case, the prosecution, Ms. Tansey, on behalf of the
> County of Placer, she has the burden of proving all the elements of
> all the crimes beyond a reasonable doubt; any quarrel with that?
>
> JUROR [M]:  No.
>
> ***
>
> MR. ZIMMERMAN:  If at the end of the case were [sic] you're
> left with a reasonable doubt, the case hasn't been proven, one of
> the elements, whatever it is, hasn't been proven beyond a
> reasonable doubt, which is required in the law, you're left with
> some lingering reasonable belief: God, I'm not sure, he did or did
> not do it, whatever it is, would you have any hesitation about
> voting not guilty?
>
> JUROR:  No, I won't.

(RT at 172-174.)

The prosecutor later questioned Juror M about reasonable doubt as follows:

/////

15

1    MS. TANSEY:  Once again, my learned colleague has gone into
     detail about the concept of reasonable doubt.  I will cover that a
2    little bit, too.

3    [Juror M.], do you have any problem with the concept that the
     People do not have to prove their case beyond all possible doubt?
4
     JUROR:  I understand the concept, yes.
5
     MS. TANSEY: How do you feel about that?
6
     JUROR:  It just depends on the situation.  If I am given all the
7    evidence on both sides, that's my full evaluation.  I couldn't say
     right now.
8
     MS. TANSEY:  Let me try to clarify that a little bit.  How do you
9    feel about the idea that everything in life is subject to some doubt?

10   JUROR:  Yes, that's true.

11   MS. TANSEY:  Would you hold the People to a higher standard of
     proof than reasonable doubt?  Would you expect the People to
12   prove our case beyond all doubt?

13   JUROR:  Yes.

14   MS. TANSEY:  Thank you.  Thank you for your candor.

15   (Id. at 181-182.)

16          When given the opportunity, Ms. Tansey attempted to challenge Juror M. for

17   cause and the trial judge denied that request, as follows:

18   MS. TANSEY:  [Juror M], I think she made it pretty clear she
     would expect us to prove our case beyond all possible doubt.
19
     MR. ZIMMERMAN:  I didn't hear that.
20
     THE COURT:  I didn't hear that either.  I thought she understood
21   from earlier questions–I think maybe she misunderstood your
     question.  I didn't get the impression that she was beyond all
22   possible doubt.  I did not hear it that way.

23   MS. TANSEY:  Okay.

24   MR. ZIMMERMAN:  I would indicate if the prosecutor doesn't
     excuse this juror, that I need to make an objection on basis of
25   Wheeler.

26   /////

                                    16

1    THE COURT:  We're not going to get there.  The challenge is
2    denied.

3    (RT at 194-195.)

4            The trial judge then resumed jury voir dire and directly questioned Juror M.

5    himself, as follows:

6            THE COURT:  [Juror M.], there was a line of questioning that Ms.
         Tansey had with you.  I want to make sure we understood you
7        correctly and make sure you understood the question.  She was
         talking about the concept of reasonable doubt.  I understood you to
8        say that you had no quarrel with that basic concept.

9        JUROR [M]:  That's correct.

10       THE COURT:  There is sort of a range of doubt, I guess, in human
         affairs.  There are things that are just filled with doubt, and then
11       there are things sort of in the mid range.  I'll put reasonable doubt
         and then an extreme range of all possible doubt.  Increasing levels
12       of certainty.  The law specifies reasonable doubt.

13       Did you understand that the concept is proof beyond a reasonable
         doubt?  It's not proof beyond all possible doubt?
14
         JUROR [M]:  Yes, I understood that.
15
         THE COURT:  Did you have any quarrel with that problem?
16
         JUROR [M]:  She says the burden of proof–I understand that he
17       doesn't have to prove beyond all reasonable doubt that there is.
         Her question was, and to others, is she held at a higher standard?
18       No, she isn't.

19       THE COURT:  Okay.  That's what I understood you to say, but I
         think there was some confusion about it.
20
         Thank you very much.
21

22   (RT at 195-196.)

23           At the evidentiary hearing, the prosecutor described Juror M's answer to her first

24   question about reasonable doubt as "evasive."  (HT 57.)  Petitioner alleges that a comparative

25   juror analysis demonstrates that the prosecutor did not challenge similarly situated "Caucasian

26   prospective jurors who gave similar, or even more non committal or confused answers when

17

questioned about how they 'felt' about the prosecutor's burden of proof." (Pet.'s Post Hr'g Br. at 19.)

Petitioner first compares Juror M's answers to Juror B's, a juror who sat at trial.[5] (Pet.'s Post Hr'g Br. at 19.) The prosecutor asked Juror B, "how do you feel about the concept of reasonable doubt versus proof beyond all possible doubt?" (RT at 191.) Juror B replied, "I think it's a good concept. I believe in it." The prosecutor followed, "and you're comfortable with that; would you not hold the prosecution to a higher standard of proof?" (Id.) Juror B replied, "that it's possible. Maybe in some cases, but in most cases, it's probably not possible." (Id.)

Petitioner argues that Juror B's answer to the prosecutor's second question was "confusing" and "objectively unclear." (Pet.'s Post Hr'g Br. at 19.) Petitioner alleges that the prosecutor failed to "explain why she was untroubled by [Juror B's] objectively unclear answer suggesting that he might not find *anything* provable beyond a reasonable doubt in most cases, but interpreted [Juror M's] statements as a 'big red flag.'" (Id., emphasis in original.) The prosecutor, however, testified as follows about her response to Juror B's answer to the second question:

> It's pretty clear to me that my response to his answer was not based on an idea that he would hold the people to a higher standard of proof than reasonable doubt. I believe, after having reviewed the transcripts, that his answer related to whether it's possible to prove a case beyond all reasonable doubt, and what he says is, it's possible, maybe in some cases, but in most cases, it's probably not possible.
>
> That answer makes more sense to me, and it also explains to me why he was not kicked off the panel.

(HT at 60.)

The prosecutor's interpretation of Juror B's answer is the only plausible explanation for Juror B's words. The prosecutor asked Juror B how he felt about the reasonable

---

[5] The letter appellations assigned to jurors are used to protect their anonymity. The juror names and corresponding numbers are provided in sealed documents lodged with the Court.

doubt standard as related to a higher standard.  Juror B's answer to the second question is consonant with his response to the first question.  In other words, Juror B agreed with the standard of proof beyond all reasonable doubt and that a higher standard may be possible in some cases but not in all, confirming why the reasonable doubt standard is necessary.  On the other hand, notwithstanding the trial judge and trial counsel's interpretation to the contrary, Juror M's responses to the prosecutor's questions could reasonably have been interpreted by the prosecutor as evasive and holding the prosecution to an impossible standard.  (RT at 181-182.)  When asked how she *felt* about the concept of proof beyond a reasonable doubt, Juror M answered that she *understood* the concept.  (Id.)  The prosecutor reasonably interpreted that response as evasive, and coupled with Juror M's stated intention to hold the prosecution to a higher standard of proof, decided to challenge Juror M for cause.  Accordingly, as related to a comparison of Juror M's answers to Juror B's, petitioner has not "established purposeful discrimination" on the part of the prosecutor.  Batson, 476 U.S. at 98.

Petitioner next compares Juror M's responses to Juror W's, a juror who was not seated for trial.  (Pet.'s Post Hr'g Br. at 19-20.)  The reason Juror W did not sit for trial was because petitioner's trial counsel exercised a challenge against her.  (RT at 199.)  A careful review of the record indicates that after trial counsel challenged Juror W, the prosecutor still had challenges remaining.  (Id.)  Therefore, it is impossible to determine whether the prosecutor would have challenged Juror W using her remaining challenges because she was not given the chance.  Therefore, Juror W and Juror M are not similarly situated for comparative analysis and petitioner has not "established purposeful discrimination."  Batson, 476 U.S. at 98; Boyd, 467 F.3d at 1145.

Petitioner next compares Juror M's responses to Juror A's, "a woman who served on the trial jury and whose son had been prosecuted for a drug offense."  (Pet.'s Post Hr'g Br. at 20.)  The prosecutor questioned Juror A about whether her past experiences with law enforcement would affect her evaluation of testimony from law enforcement officers.  (RT at

185-186.)  Petitioner argues that the prosecutor's failure to challenge Juror A, after acknowledging that her testimony might raise a "red flag," was a pretext for discrimination when compared to the prosecutor's treatment of Juror M.  (Pet.'s Post Hr'g Br. at 20-21.)  The prosecutor acknowledged that Juror A's responses might be a red flag, but "that alone would only be one part of the puzzle."  (HT at 37.)  The prosecutor's explanation makes sense, i.e. she weighted jurors' responses about reasonable doubt more heavily than responses about interactions with law enforcement.  Such varied weighting is not a pretext for discrimination.  Therefore, Juror A and Juror M are not similarly situated for comparative analysis and petitioner has not "established purposeful discrimination."  Batson, 476 U.S. at 98; Boyd, 467 F.3d at 1145.

The prosecutor's second reason for exercising the peremptory challenge against Juror M was "the way she interacted with me...the primary feature of that was that she would not look me in the eye.  She'd glance at me, but she wouldn't look me in the eye...there was something about her body language that made me feel that there was a hostility there."  (HT at 8.) The fact that a prosecutor's reasons may be "founded on nothing more than a trial lawyer's instincts about a prospective juror" does not "diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  U.S. v. Power, 881 F.2d 733, 740 (9th Cir. 1989) (quoting United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989)).  There is no indication in the record that the prosecutor's testimony about her instinct about Juror M is anything but an actual reason for exercising the challenge against Juror M.  Accordingly, petitioner has not "established "established purposeful discrimination" on the part of the prosecutor.  Batson, 476 U.S. at 98.

After reviewing the record, including post-hearing briefs and the voir dire transcript for comparative analysis, the undersigned finds that petitioner has not met his burden of "proving purposeful racial discrimination."  Johnson, 545 U.S. at 168  Accordingly, petitioner's Batson claim is denied.

/////

B.  Due Process and Suggestive Identification

Petitioner alleges that his right to due process and a fair trial was violated because "he was identified as the individual who personally used a gun during the charged offense by an unconstitutionally suggestive identification procedure."  (Am. Pet. at 12-19.)

The last reasoned decision with respect to petitioner's claim is the opinion of the California Court of Appeal for the Third Appellate District on direct appeal, as follows:

V
*The Field Showup Was Not Impermissibly Suggestive*

[Petitioner] argues the court erred in denying his in limine motion to exclude evidence Starfusky and Thomas identified [petitioner] the night of the burglary in a field showup.  He contends that the field showup was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law."  We disagree.

Both [petitioner] and Carter were apprehended near the Best Western minutes after the robbery occurred, with the loot, a gun, and paraphernalia connecting them to the robbery.  The offer of proof during the in limine motions was that the police individually transported Thomas and Starfusky from the hotel to identify [petitioner] and Carter.  The suspects were displayed separately to each victim.  Prior to the showup, the officers admonished the victims these suspects might not be the robbers, and it was just as important that they not identify an innocent person as it was they identify a guilty person.

Next, the officers presented [petitioner] for identification.  During Starfusky's view of [petitioner], the officers asked [petitioner] to zip up his jacket.  Starfuksy told the officers he could only identify the robber based upon his clothing and general physical appearance and identified [petitioner] as that person.  Starfusky could not identify Carter.

Thomas positively identified [petitioner].  During her view of [petitioner], officers asked for the "beanie and bandana for the black man."  The police put the items on [petitioner] and Thomas identified him as one of the robbers.  Thomas could not identify Carter as one of the suspects even though he was presented in a similar fashion.

According to the prosecutor, each victim confirmed the identification was based upon the build of the suspect, the shape of his head, his race, his gender, and the distinctive pants he was wearing.

[Petitioner] moved to exclude the evidence of these field showups at trial as unduly suggestive.  The trial court denied that motion.  [Petitioner] argues this showup violates due process because he was "brought out in hand cuffs from a patrol car at night.  The witnesses viewed him 'some distance away' in headlights of a patrol vehicle.  The officers put a beanie on his head and held a mask up to his face and alternately took the mask away. [and] The videotaped procedure records an officer saying 'Get me the beanie and the bandana for the black man.'"

A pretrial identification procedure violates a defendant's constitutional due process rights if it is so impermissibly suggestive it creates "a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968)[citation omitted]; People v. Wimberly, 5 Cal.App.4th 773, 778 (1992).  A prompt "'single person showup'" involving a suspect who has been apprehended close in time and place to the offense is not considered inherently unfair; the procedure has been upheld on the theory that timely identification enhances reliability and excludes from consideration innocent persons.  (People v. Floyd, 1 Cal. 3d 694, 714 (1970)[citation omitted]; People v. Irvin, 264 Cal. App. 2d 747, 759-760 (1968).

"The defendant bears the burden of proving that the procedure resulted in such unfairness that it infringed the right to due process.  [Citation.] On appeal, we review the totality of the circumstances in determining whether an identification procedure was unconstitutionally suggestive. [Citation.] We must resolve all evidentiary conflicts in favor of the trial court's finding and uphold that finding if substantial evidence supports it. [Citation.]" People v. Wimberly, supra, 5 Cal. App. 4th at p. 788.  In determining the fairness of such a showup, we consider: "(1) The opportunity of the witness to observe the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' description of the suspect, (4) the certainty shown by the witness at the confrontation, and (5) the length of time between the crime and the confrontation."  People v. Cowger, 202 Cal. App. 3d 1066, 1072 (1988).

When we review these factors, we conclude the showups were not unnecessarily suggestive.  First, the time between the showup and the crime was very short.  Thus, the vision of the perpetrators was still freshly in the minds of the victims.

Second, the victims gave good descriptions of the suspects showing both their opportunity to observe the suspects and their degree of attention to the details of the robber: Starfusky described [petitioner] as "between 5'10" and 6 feet ([Petitioner] is 5'11"), with a stocky build ([petitioner] [i]s about 180 pounds.)  He also described in some detail what [Petitioner] was wearing: a black jacket (zipped up), black pants that had 'heavy' stitching, and

appeared to be a heavy, 'rugged' type of pant, a black 'beanie' style cap, and a dark colored, possibly blue bandana." Thomas gave a similarly detailed and accurate description. Each witness spent time with [petitioner] during this crime in very close quarters. The witnesses had ample time to observe the uncovered portions of [petitioner's] face and his clothing. Both victims identified [petitioner] based on his skin color, the shape of his head, his build, the portion of his face that was uncovered, and his clothing.

Moreover, the victims were not influenced to identify [petitioner] by each other or by the police. Each victim viewed each suspect separately and without the input of the other victim. The officers did not tell the victims that these suspects were the robbers or that they had found any of the corroborating evidence. Each victim was properly admonished it was just as important to exonerate an innocent person as it was to identify a guilty one. That the victims did not identify Carter as [petitioner's] accomplice further supports the conclusion the field showup was not unduly suggestive.

The use of clothing in the field showup was not unduly suggestive either. By its very nature, in a typical field showup, the suspect will be adorned in the garb in which he allegedly committed the offense. Due process is not violated by requiring a field showup suspect to wear the clothes in which he committed the offense. See People v. Floyd, supra, 1 Cal. 3d at pp. 713-714 (no due process violation in requiring a suspect in a lineup to wear the ordinary clothes in which he supposedly committed the offense).

Here, the clothing [petitioner] wore either were, or were similar to, items the robber had worn during the robbery and were found with [petitioner] at the time of his arrest. [Petitioner] was arrested wearing a black jacket and was seen throwing a cap and scarf away when police arrived on the scene.

Under the totality of the circumstances, the showups did not violate [petitioner's] right to due process.

(Opinion at 16-20.)

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. Neil v. Biggers, 409 U.S. 188, 198 (1972).

1    See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process

2    in determining the constitutionality of pretrial identification procedures: first, whether the

3    procedures used were impermissibly suggestive and, if so, whether the identification was

4    nonetheless reliable).  Each case must be considered on its own facts and whether due process

5    has been violated depends on "'the totality of the circumstances' surrounding the confrontation."

6    Simmons v. United States, 390 U.S. 377, 383 (1968).  See also Stovall, 388 U.S. at 302.

7            An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the

8    witness 'This is the man.'"  Foster v. California, 394 U.S. 440, 443 (1969).  One-on-one

9    identifications are suggestive.  See Stovall, 388 U.S. at 302.  However, "the admission of

10   evidence of a showup without more does not violate due process."  Biggers, 409 U.S. at 198.

11   One-on-one identifications are sometimes necessary because of officers' and suspects' strong

12   interest in the expeditious release of innocent persons and the reliability of identifications made

13   soon after and near a crime.  See, e.g., United States v. Kessler, 692 F.2d 584, 585 (9th Cir.

14   1982); United States v. Coades, 549 F.2d 1303, 1305 (9th Cir. 1977).

15           If the flaws in the pretrial identification procedures are not so suggestive as to

16   violate due process, "the reliability of properly admitted eyewitness identification, like the

17   credibility of the other parts of the prosecution's case is a matter for the jury."  Foster v.

18   California, 394 U.S. at 443, n.2; see also Manson v. Brathwaite 432 U.S. 98, 116 (1977)

19   ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification

20   testimony that has some questionable feature").  On the other hand, if an out-of-court

21   identification is inadmissible due to unconstitutionality, an in-court identification is also

22   inadmissible unless the government establishes that it is reliable by introducing "clear and

23   convincing evidence that the in-court identifications were based upon observations of the suspect

24   other than the lineup identification."  United States v. Wade, 388 U.S. 218, 240 (1967).  See also

25   United States v. Hamilton, 469 U.S. 880, 883 (9th Cir. 1972) (in-court identification admissible,

26   notwithstanding inherent suggestiveness, where it was obviously reliable).

24

Factors indicating the reliability of an identification include: (1) the opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention (including any police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the identification.  Manson, 432 U.S. at 114 (citing Biggers, 409 U.S. at 199-200)).  The "central question," however, is "whether under the 'totality of the circumstances' the identification is reliable even though the confrontation procedure was suggestive."  Biggers, 409 U.S. at 199.

Even assuming that the identification procedure used here was suggestive, the undersigned concludes that the in-court identification was nonetheless reliable because it was not especially likely to yield an "irreparable misidentification."  Manson, 432 U.S. at 116 (internal quotation and citation omitted); Kessler, 692 F.2d at 586-87 (unless the procedure used is so suggestive that it raises a "very substantial likelihood of irreparable misidentification," doubts go to the weight, not the admissibility, of the evidence) (internal quotation and citation omitted). Heather Thomas identified petitioner at trial as the robber holding the gun.  (RT at 338, 342.) This identification inevitably flowed from the fact that she saw the gunman's face when his bandana fell.  (Id. at 338.)  Given the short duration from the crime to the field showup, this court cannot find that Heather Thomas' in-court identification of petitioner was so unreliable that its admission into evidence violated petitioner's constitutional rights.

Notwithstanding petitioner's challenges to the identification procedure described above, this court cannot conclude that the procedure resulted in a "very substantial likelihood of irreparable misidentification."  Kessler, 692 F.2d at 586-87.  The opinion of the California Court of Appeal was not contrary to, or an unreasonable application of federal law.  28 U.S.C. §2254. Accordingly, petitioner is not entitled to relief on this claim.

C.  Prosecutorial Misconduct

Petitioner alleges that his right to counsel was violated when the prosecutor improperly contacted a defense fingerprint expert.  (Am. Pet. at 19-20.)

The last reasoned decision with respect to petitioner's claim is the opinion of the

California Court of Appeal for the Third Appellate District on direct appeal, as follows:

VI

*No Prosecutorial Misconduct Occurred Here*

[Petitioner] argues the trial court "failed to remedy prosecution misconduct for attempting to interview [petitioner's] fingerprint expert." We disagree.

In a supplemental motion in limine, the prosecutor alleged [petitioner] had participated in an ex parte hearing with the court. The court then sealed evidence in the court file that potentially incriminated [petitioner]. This evidence related to work performed by [petitioner's] fingerprint expert. The prosecutor alleged the fingerprint expert's actions of examining the gun in this case might have destroyed the prosecution's ability to obtain the same incriminating evidence potentially discovered by the defense's expert. The People cited People v. Meredith, 29 Cal. 3d 682, 686 (1981), which holds "an observation by defense counsel or his investigator, which is the product of privileged communication, may not be admitted [at trial] unless the defense by altering or removing physical evidence has precluded the prosecution from making that same observation." Thus, the prosecutor sought an order of the trial court turning over any incriminating evidence on this point in the trial court's file.

In response, [petitioner] represented to the court that the night before the hearing on this motion, an investigator for the prosecutor's office called [petitioner's] fingerprint expert at home. The investigator asked the expert if he had prepared a report and sent it to defense counsel's office. The expert said he had not written a report, but had provided an oral report to defense counsel. The investigator asked the expert what work he had done on the case, but the expert refused to answer that question without checking with defense counsel. The investigator said the prosecution would subpoena the expert for trial and asked permission to serve the subpoena by facsimile. The expert received the subpoena. [Petitioner] moved for dismissal based upon prosecutorial misconduct and to quash the subpoena.

The prosecutor responded the only instruction she gave the investigator was to find out how to contact the expert to subpoena him. The trial court denied the motion to dismiss and granted the motion to quash the subpoena.

[Petitioner] argues a prosecutor who obtains or attempts to obtain privileged work product from a defense expert must be sanctioned to punish the misconduct and to discourage further misconduct. He alternately contends either prejudice must be presumed from

this record or he has demonstrated prejudice.  We agree that intentional conduct by a prosecutor to discover privileged work product or attorney-client communications may sometimes require the trial court to dismiss the case, but this is not such a case.

When conduct by a prosecutor "is so outrageous as to interfere with an accused's right of due process of law, proceedings against the accused are thereby rendered improper."  Boulas v. Superior Court, 188 Cal. App. 3d 422, 429 (1986).  We review a trial court's determination on this issue for an abuse of discretion.  (Id. at p. 435.)  "Dismissal is, on occasion, used by courts to discourage flagrant and shocking misconduct by overzealous governmental officials in subsequent cases."  (Id. at p. 429.)  This type of due process violation, however, requires the court to conclude that the prosecutor's conduct shocks the court's conscience.  Morrow v. Superior Court, 30 Cal. App 4th 1252, 1261 (1994).

Invasion into the attorney-client or work product privileges may also constitute a violation of the defendant's Sixth Amendment right to counsel.  See People v. Benally, 208 Cal. App. 3d 900, 908-909 (1989).

In Morrow, the prosecutor instructed her investigator to listen in on a private attorney-client communication held inside the courthouse. Morrow, supra, 30 Cal. App. 4th at p. 1255.  The investigator sat near the door where the conversation occurred.  Ibid.  At the conclusion of the eavesdropping session, the investigator returned to the prosecutor and whispered something into her ear.  Ibid.  In an internal investigation, the prosecutor and investigator refused to disclose what the investigator overheard, or what the investigator told the prosecutor.  Id. at p. 1256.  The prosecutor told her office that she merely told her investigator to determine if the [petitioner] would agree to a continuance so she would not have to reschedule a vacation.  Ibid.  In a later investigation by the Attorney General's Office, the prosecutor changed her story and said she was motivated by a concern for the safety of defense counsel.  Ibid.  In that investigation, the investigator claimed to have heard that the defendant's alibi witness' recantation was untruthful.  Ibid.  At the hearing on the defendant's motion to dismiss, both the prosecutor and the investigator refused to testify, invoking their Fifth Amendment privilege against self-incrimination.  Id. at p. 1257. The trial court denied the motion to dismiss.  Id. at 1258.

The appellate court reversed.  Morrow, supra, 30 Cal. App. 4th at p. 1263.  The court noted that when a prosecutor engages in misconduct, "'the burden falls upon the People to prove, by a preponderance of the evidence, that sanctions are not warranted because the defendant was not prejudiced by the misconduct. [Citations.]' [T]he People also have the burden to show that there was no substantial threat of demonstrable prejudice."  Id. at p. 1258.  On these facts, the appellate court concluded the People

failed to meet this burden.  <u>Ibid</u>.  Moreover, the prosecutor's use of "the hallowed confines of the courtroom where the rule of law and fairness should be revered" was especially heinous.  <u>Id</u>. at pp. 1261, 1263.  The court ordered the case dismissed.  <u>Id</u>. at p. 1263.

In <u>Boulas v. Superior Court</u>, <u>supra</u>, 188 Cal. App. 3d 422, Division Six of the Court of Appeal, Second Appellate District concluded the egregious conduct of the police and prosecutor was sufficient to justify dismissal of the action.  There, the prosecutor told the defendant he would have to fire his defense lawyer and retain one the district attorney approved of in order to obtain a plea bargain.  <u>Id</u>. at p. 426.  The police, with the tacit approval of the prosecutor, went so far as to direct the defendant to the specific attorney they wanted him to select.  <u>Id</u>. at pp. 427, 432.  The defendant followed those instructions.  <u>Id</u>. at pp. 427-428.  The appellate court concluded this course of conduct caused irremediable harm to the defendant's relationship with his attorney and was, therefore, improper.  <u>Id</u>. at p. 433.  "No relief, such as suppression or reversal of conviction, would remedy the violation.  Furthermore, considering the extent and seriousness of the conduct of those in position of authority and public trust, we find the grave sanction of dismissal to be the sole appropriate remedy for intentional and calculated violation of Boulas' rights.  We find the government conduct in the present matter to be outrageous in the extreme, and shocking to the conscience; we are, thereby, compelled to order the dismissal of the present case."  <u>Id</u>. at p. 434.

Where an agent of the prosecution has overheard defense strategies, but there is a showing of no actual prejudice or threat of prejudice, our courts have not imposed the serious sanction of dismissal.  <u>People v. Benally</u>, <u>supra</u>, 208 Cal. App. 3d at p. 909.  In <u>Benally</u>, the defendant's attorney and his investigator held a conference in one of the interview rooms at the police station.  <u>Id</u>. at pp. 905-906.  Unbeknownst to the attorney or his investigator, a police officer overheard their conversation because tape recording equipment for that room was accidentally left on and their conversation was recorded.  <u>Id</u>. at p. 906.  After listening to the conversation for about 30 seconds, the officer claimed he turned off the equipment, although there was no break in the tape to corroborate this story.  <u>Ibid</u>.  The officer claimed to have heard the general facts of the case, but nothing about defense strategy.  <u>Ibid</u>.  The tape, on the other hand, was replete with attorney work product in the form of discussions about the defense strategy.  <u>Id</u>. at p. 907.  The officer gave the tape to a deputy district attorney who did not listen to it.  <u>Id</u>. at p. 906.  Upon the defense's motion to dismiss the case, the trial court directed the officer not to discuss the tape with anyone and directed the defendant to request a hearing if he believed any evidence or questions may have been inspired by the contents of the tape.  <u>Id</u>. at pp. 906-907.  As to the defendant's Sixth Amendment claim of the violation of his right to counsel, the court drew on <u>Weatherford v. Bursey</u>, 429 U.S. 545

(1977) which held that infringement of a defendant's right to counsel does not require dismissal per se.  Rather, "a showing of prejudice [is] essential to establish a claim that one's Sixth Amendment rights had been violated."  People v. Benally, supra, 208 Cal. App. 3d at p. 908.  Such a showing of prejudice could be based on a showing that the attorney-client conversations were presented at trial, were used for other purposes to the detriment of the defendant, or provided the prosecutor with information about the defense strategy.  Id. at p. 908.  The court concluded dismissal was not appropriate because there was no showing of prejudice or threat thereof because the officer did not testify at trial about the conversation, none of the prosecution's evidence originated from the evidence on the tape, there was no showing the taped conversations were used in any way that prejudiced the defendant, and the prosecutor did not learn about the defendant's trial preparations.  Id. at p. 909.

Here, we conclude the trial court's order properly denied the motion to dismiss the case.  First, there was no evidence in the record the expert provided any privileged attorney-client or work-product communications to the investigator. [Petitioner's] offer of proof was that the expert told the investigator only that he had prepared an oral report.  Beyond that, he steadfastly refused to provide any information.  Moreover, the undisputed representation of the prosecutor was that the investigator's sole job was to obtain an address, not examine the expert.  The court quashed the subpoena directed at that witness and left the evidence sealed.

Second, there is no hint of any prejudice or threat of prejudice in this record.  There is no allegation this conversation was used to [petitioner's] prejudice in any way.  The investigator did not testify at trial about this conversation.  Nothing about this conversation led to the discovery of any evidence used against [petitioner] at trial.  Indeed, no evidence was admitted concerning the subject fingerprints at trial.  Finally, the prosecutor did not learn anything about [petitioner's] trial preparations.

Third, we see no compelling reason to wield the sword of dismissal based on the prosecutor's actions.  The prosecutor had a legitimate reason to contact [petitioner's] fingerprint expert: to subpoena him.  If [petitioner] had deposited inculpatory evidence into the court under seal, the People might have been entitled to discover that evidence.  People v. Sanchez, 24 Cal. App. 4th 1012, 1025, 1028 (1994).  Further, if the expert witness had irrevocably altered the fingerprints on an incriminating object, the People would have been entitled to question the expert on that point.  People v. Meredith, supra, 29 Cal. 3d at p. 695.  This is a far cry from the intentional and secret destruction of the attorney-client relationship condemned by the court in Boulas v. Superior Court, supra, 188 Cal. App. 3d at pages 433-434, or the surreptitious and deliberate

/////

29

1        eavesdropping condemned in <u>People v. Benally</u>, <u>supra</u>, 208 Cal.
2        App. 3d at pages 905-906.

    In sum, we conclude the trial court did not err in denying the
3        motion to dismiss because there was not disclosure of privileged
    attorney-client communications or work product, no prejudice to
4        [petitioner], and no improper motive on the part of the prosecutor.

5    (Opinion at 20-28.)

6        "The Sixth Amendment provides that an accused shall enjoy the right 'to have the

7    Assistance of Counsel for his defense.'  This right, fundamental to our system of justice is meant

8    to assure fairness in the adversary criminal process. [Citations omitted.]"  <u>U.S. v. Morrison</u>, 449

9    U.S. 361, 364 (1981).  Governmental conduct must be proved to render counsel's assistance to

10   the defendant ineffective.  <u>Id</u>.  "Sixth Amendment deprivations are subject to the general rule that

11   remedies should be tailored to the injury suffered from the constitutional violation and should not

12   unnecessarily infringe on competing interests."  <u>Id</u>.  "In addition, certain violations of the right to

13   counsel may be disregarded as harmless error."  <u>Id</u>. at 365; <u>see</u> <u>U.S. v. Rogers</u>, 751 F.2d 1074,

14   1078 (1985) ("When the action of Government agents involves a violation of the defendant's

15   constitutional rights and yet does not require dismissal of the indictment, it would follow, a

16   fortiori, that merely inducing a witness to violate an ethical obligation of confidentiality to a

17   client would not require dismissal of the indictment.")

18       Here, even assuming the prosecution's investigator violated petitioner's right to

19   counsel by contacting a defense fingerprint expert, petitioner has failed to allege any prejudice as

20   a result of that action.  Petitioner admits that after an in limine motion made by the prosecution to

21   seek discovery of sealed defense evidence, the trial judge denied the prosecutor's motion.  (RT

22   221, 225-226.)  Therefore, no prejudice occurred.

23       Moreover, the opinion of the California Court of Appeal was not contrary to, or an

24   unreasonable application of, clearly established Federal law.  28 U.S.C. § 2254.  Accordingly,

25   petitioner is not entitled to relief on this claim.

26   /////

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 12, 2010.

UNITED STATES MAGISTRATE JUDGE

014c; morr0354.157

31